IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROL BECHTER, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 13-7389 |
| | : | |
| v. | : | |
| | : | |
| FEDERAL EXPRESS CORPORATION | : | |
| LONG TERM DISABILITY PLAN and | : | |
| AETNA LIFE INSURANCE COMPANY, | : | |
| | : | |
| Defendants. | : | |

**<u>MEMORANDUM OPINION</u>**

Smith, J.                                                                                    March 31, 2015

The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, provides protections for employees participating in their employers' benefits plans. Based upon her significant mental health issues, the plaintiff employee received short-term disability benefits under her employer's short-term disability plan and, after the expiration of those benefits, long-term disability benefits under the "occupational disability" portion of the employer's long-term disability plan. As those long-term disability benefits were about to expire, the plaintiff submitted a claim for continued long-term disability benefits because she asserted that issues with her knees, back, and neck prevented her from working in any occupation for a minimum of 25 hours per week and, as such, qualified her for a "total disability" under the long-term disability plan. The claims-paying administrator denied the plaintiff's claim for total disability benefits because it determined that the plaintiff did not submit significant objective findings to support a total disability under the plan. After the claims-paying administrator denied the employee's appeal of the total disability benefits denial, the employee

filed the instant ERISA action against the claims-paying administrator and her employer's long-term disability plan.

Currently before the court are the parties' cross-motions for summary judgment on the issue of whether the denial of continued long-term disability benefits was arbitrary and capricious. As explained below, the court finds that there are no genuine issues of material fact and that the claims-paying plan administrator's decision to deny the plaintiff's request for continued long-term disability benefits was not without reason, unsupported by substantial evidence, or erroneous as a matter of law. Accordingly, the court will grant the motion for summary judgment filed by the plan administrator and the employer's plan and deny the motion for summary judgment filed by the plaintiff employee.

## I.   PROCEDURAL HISTORY

The plaintiff, Carol Bechter, commenced this ERISA action by filing a complaint against the originally-named defendants, FedEx Corporation and Aetna Life Insurance Company ("Aetna"), on December 17, 2013. Compl., Doc. No. 1. In the complaint, the plaintiff essentially contends that the defendants acted in an arbitrary and capricious manner when they terminated her long-term disability ("LTD") benefits. Compl. at ¶ 24. The defendants separately filed answers to the complaint on February 18, 2014. Doc. Nos. 7, 8. Apparently, the plaintiff had incorrectly identified FedEx Corporation as a defendant, so she filed an amended complaint on March 24, 2014, in which she changed one of the named defendants from FedEx Corporation to Federal Express Corporation Long Term Disability Plan ("FedEx LTD Plan").[1] Doc. No. 13.

---

[1] It appears that when the parties conducted their Federal Rule of Civil Procedure 26(f) conference, the defendants consented to the plaintiff filing the amended complaint to substitute FedEx LTD Plan for FedEx Corporation as the named defendant. *See* Report of Parties' Planning Meeting at 2, Doc. No. 12.

The Honorable R. Barclay Surrick issued a scheduling order in this case on March 28, 2014.  Doc. No. 15.  On April 22, 2014, Chief Judge Petrese B. Tucker reassigned this case to the undersigned.[2]  Doc. No. 16.

The defendants separately filed answers to the amended complaint on May 27, 2014.  Doc. Nos. 19, 20.  The court held an interim pretrial conference with counsel on June 17, 2014, after which the court entered an amended scheduling order.  Doc. Nos. 21, 22.  The defendants filed the applicable administrative record on July 23, 2014.  Doc. No. 23.

The plaintiff and the defendants separately filed cross-motions for summary judgment, statements of material facts in support of their respective motions, and supporting memoranda of law on August 4, 2014.  Doc. Nos. 29-32.  The parties then filed responses to the motions on August 29, 2014.  Doc. Nos. 33, 34.  The court heard oral argument on the motions for summary judgment on January 13, 2015.  Doc. No. 39.  During oral argument, the court pointed out to counsel that there appeared to be a document missing from the administrative record and, as such, the court (1) granted the defendants leave to search for this document and to supplement the administrative record, and (2) permitted the parties to file supplemental briefs regarding this additional document.  FedEx LTD Plan filed that missing document with the court on January 22, 2015.  Doc. No. 40.  The defendants and the plaintiff filed supplemental briefs on January 27, 2015, and January 30, 2015, respectively.  Doc. Nos. 41, 42.  With the missing document now part of the record before the court, the cross-motions for summary judgment are ripe for disposition.

---

[2] Although the clerk of court's office did not docket the order until April 22, 2014, Chief Judge Tucker appears to have signed the order on April 21, 2014.  *See* Order, Doc. No. 16.

## II.   DISCUSSION

### A.   Standards of Review

#### 1.   Summary Judgment Standard

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning,* 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir. 1995)).  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute").  The non-movant must show more than the "mere existence of a scintilla of

4

evidence" for elements on which the non-movant bears the burden of production. *Anderson,* 477 U.S. 242, 252 (1986). Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.,* 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

The court "may not weigh the evidence or make credibility determinations." *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Petruzzi's IGA Supermarkets., Inc. v. Darling–Del. Co. Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993)). Instead, "[w]hen considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should

grant summary judgment in favor of the moving party.  *Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (citation omitted).

### 2.        Standard of Review for Benefit Denials Under ERISA

The plaintiff has brought this action under section 502(a)(1)(B) of ERISA, which permits a participant or beneficiary of a covered policy to bring a civil action to recover the benefits due under the terms of the policy.  29 U.S.C. § 1132(a)(1)(B).  Generally, the court must review the denial of benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  "If the plan gives the administrator or fiduciary discretionary authority to make eligibility determinations," the court must review its decision "under an abuse-of-discretion (or arbitrary and capricious) standard."  *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citations omitted).[3]

Here, the parties agreed in their submissions and at oral argument that the court should apply the abuse-of-discretion (or arbitrary and capricious) standard of review.  *See* Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 4 ("Bechter's claim is subject to review under the arbitrary and capricious standard."), Doc. No. 31; Pl.'s Mot. for Summ. J. Pursuant to Fed. R. Civ. P. 56 at 1, ¶ 3 ("Defendants' termination of plaintiff's long term disability benefits was arbitrary and capricious and her Motion for Summary Judgment should therefore be granted."), Doc. No. 32.  Under this standard, "[a]n administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Fleisher v. Standard Ins. Co.,* 679 F.3d 116, 121 (3d Cir. 2012) (internal quotations omitted).  "A decision is supported by substantial evidence if there is sufficient evidence for a

---

[3] The abuse-of-discretion standard and the arbitrary and capricious standard are used "interchangeably" in ERISA cases.  *Viera*, 642 F.3d at 413.

reasonable person to agree with the decision." *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000).

The arbitrary and capricious standard of review "is narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation omitted).  Although "the arbitrary and capricious standard is extremely deferential, [i]t is not ... without some teeth. Deferential review is not no review, and deference need not be abject." *Kuntz v. Aetna Inc.*, No. 10-CV-00877, 2013 WL 2147945, at *4 (E.D. Pa. May 17, 2013) (citations and internal quotation marks omitted).

> In addition,
>
> [o]n a motion for summary judgment in an ERISA case where the plaintiff claims that benefits were improperly denied, a reviewing court is generally limited to the facts known to the plan administrator at the time the decision was made. *Post v. Hartford Ins. Co.,* 501 F.3d 154, 168 (3d Cir. 2007), *overruled on other grounds, Doroshow,* 574 F.3d 230. "Consequently, when, as here, a plaintiff alleges that a plan administrator, such as [Aetna], abused its discretion in deciding to terminate benefits, [the Court] generally limit[s][its] review to the administrative record, that is, to the 'evidence that was before the administrator when [it] made the decision being reviewed.'" *Sivalingam v. Unum Provident Corp.,* 735 F.Supp.2d 189, 194 (E.D. Pa. 2010) (quoting *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 440 (3d Cir. 1997)); *see also Johnson v. UMWA Health & Ret. Funds,* 125 F. App'x 400, 405 (3d Cir. 2005) ("This Court has made clear that the record for arbitrary and capricious review of ERISA benefits denial is the record made before the Plan administrator, which cannot be supplemented during the litigation.").

*Plank v. Devereux Found.*, No. 13-cv-7337, 2015 WL 451096, at *6 (E.D. Pa. Feb. 2, 2015) (alterations in original).

## B.     Applicable Record

### 1.      The Long-Term Disability Plan

Federal Express Corporation ("FedEx") established and maintained a LTD plan (the "LTD Plan"), governed by ERISA, to provide for the funding and payment of LTD benefits for eligible employees.[4]  *See* Administrative Record at AR-000532, Doc. No. 25; *see also* Am. Compl. at ¶ 7; Def. Aetna Life Ins. Co.'s Answer to Am. Compl. ("Aetna's Answer") at ¶ 7.[5] FedEx is the LTD Plan administrator and is charged with administering the LTD Plan, acting through its employee benefits department.  AR-000533, AR-000535.  During the relevant time period for the plaintiff's claim, Aetna was the claims-paying administrator for the LTD Plan. AR-000445, AR-000486, AR-000534.

Under the LTD Plan, a "Covered Employee" is eligible to receive long-term benefits from the LTD Plan if he or she incurs a "Disability" as the LTD Plan defines that term.[6]  AR-000550.  The LTD Plan provides a monthly "Disability Benefit for a Covered Employee equal to 60% of [the Covered Employee's] Basic Monthly Compensation up to a maximum Disability Benefit of . . . $10,000 per month."  *Id.*

---

[4] The parties agree that the LTD Plan is an employee welfare benefit plan governed by ERISA.  *See* Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. at ¶ 1, Doc. No. 30; Pl.'s Reply to Defs.' Undisputed Material Facts in Supp. of Their Mot. for Summ. J. at ¶ 1, Doc. No. 34.

[5] In supplying the administrative record, the defendants did so through a declaration of John Perrine, a senior paralegal in FedEx's legal department.  Decl. of John Perrine, Doc. No. 25.  Unless otherwise specifically noted, the court shall designate all future references to the administrative record by referencing the specific page therein without referencing Mr. Perrine's declaration.

In addition, the court recognizes that the pleadings and Mr. Perrine's declaration filed in this case are not part of the administrative record for purposes of analyzing the propriety of the defendants' denial of Total Disability benefits under the LTD Plan.  Nonetheless, the court has briefly referenced them in this part of the opinion to complete the factual background of this case and has not considered the information therein in addressing the parties' claims in this case.

[6] The LTD Plan defines a "Covered Employee" as "an Eligible Employee who becomes covered by the Plan as provided in Section 2.1."  AR-000536.  The LTD Plan defines an "Eligible Employee" in pertinent part as "an Employee who is engaged in Permanent Full-Time Employment with a Sponsoring Employer."   AR-000537.

As indicated above, the LTD Plan only provides benefits if the Covered Employee incurs a Disability.  The LTD Plan defines a Disability (or "Disabled") as

> either an Occupational Disability or a Total Disability; provided, however, that a Covered Employee shall not be deemed to be Disabled or under a Disability unless he is, during the entire period of Disability, under the direct care and treatment of a Practitioner and such Disability is substantiated by significant objective findings which are defined as signs which are noted on a test or medical exam and which are considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms.

AR-000536-AR-000537.

The LTD Plan provides LTD benefits for a period of up to two years if the Covered Employee incurs an "Occupational Disability."  AR-000550, AR-000552.  The LTD Plan defines an "Occupational Disability" in relevant part as "the inability of a Covered Employee, because of a medically-determinable physical or functional impairment or a medically-determinable Mental Impairment (other than an impairment caused by a Chemical Dependency), to perform the duties of his regular occupation."  AR-000540-AR-000541.

To receive LTD benefits beyond the two-year period for an Occupational Disability, a Covered Employee must meet the LTD Plan's definition of "Total Disability."  AR-000456, AR-000544, AR-000552.[7]  The LTD Plan defines a "Total Disability" as "the complete inability of a Covered Employee, because of a medically-determinable physical or functional impairment (other than an impairment caused by a mental or nervous condition or a Chemical Dependency), to engage in any compensable employment for twenty-five hours per week."  AR-000544.

---

[7] The LTD Plan states that a Disability Benefit "shall cease to be paid to a Disabled Covered Employee when the earliest of the following events occurs with respect to such Employee: . . . (3) after 24 months of Disability Benefit eligibility . . . for an Occupational Disability."  AR-000552.  The Summary Plan Description ("SPD") also states that LTD benefits conclude after 24 months if the Covered Employee "reach[es] the end of 24 months of benefits under this LTD Plan, [or] if your disability is an occupational disability or is due to a mental impairment or nervous condition."  AR-000460.

For a Covered Employee's to prove a Disability, the LTD Plan provides as follows:

No Disability Benefit shall be paid under the Plan unless and until the Claims Paying Administrator has received an application for benefits and information sufficient for the Claims Paying Administrator to determine pursuant to the terms of the Plan that a Disability exists. Such determination shall be made in a fair and consistent manner for all participants in the Plan. Such information may, as the Claims Paying Administrator shall determine, consist of a certification from the Covered Employee's attending Practitioner, in the form prescribed by the Claims Paying Administrator, information in the form of personal references, narrative reports, pathology reports, x-rays and any other medical records or other information as may be required by the Claims Paying Administrator. In addition, a Covered Employee may be required, as the Claims Paying Administrator shall determine, to submit continuing proof of Disability in the form of the information described above, as well as evidence that he continues to be under the care and treatment of a Practitioner during the entire period of Disability. If, in the opinion of the Claims Paying Administrator, the Practitioner selected by the Covered Employee cannot substantiate the Disability for which a claim is being made or benefits are being paid hereunder, such Employee may be required to submit himself to an examination by a Practitioner selected by the Claims Paying Administrator. The burden of proof for establishing a Disability is on the Covered Employee.

AR-000574-AR-000575.

The SPD provides additional guidance for an employee as to how to prove a disability and states in pertinent part as follows:

You or your health care professional must provide proof that you are disabled, based on significant objective findings such as:

[-] Medical examination findings
[-] Test results
[-] X-ray results
[-] Observation of anatomical, physiological or psychological abnormalities

*It is important to remember pain alone is not proof of disability.*

AR-000456. The SPD also provides that "[i]f the information from [the Covered Employee's] health care professional does not prove that [the Covered Employee] is disabled, Aetna may ask you to submit to an independent medical exam by a health care professional of [Aetna's] choosing." AR-000457.

10

If Aetna denies a claim for LTD benefits, it must provide the Covered Employee with a Notice of Denial.[8]   AR-000576-AR-000577.   Once Aetna denies the claim, the Covered Employee has the right to request the appeal committee to review the denial of benefits.   AR-000579.   In addition, the Covered Employee has the right to "submit written comments, documents, records, and other information relating to the claim for the benefits in the manner and within the time reasonably set by the Administrator in order that such submissions may be prepared for and reviewed by the appeal committee."   AR-000580.

When reviewing the denial of benefits appeal, Aetna's appeal committee has the power to

> [i]nterpret the Plan's provisions in its sole and exclusive discretion in accordance with its terms with respect to all matters properly brought before it pursuant to this Section 5.3, including, but not limited to, matters relating to the eligibility of a claimant for benefits under the Plan.  The determination of the appeal committee shall be made in a fair and consistent manner in accordance with the Plan's terms and its decision shall be final, subject only to a determination by a court of competent jurisdiction that the committee's decision was arbitrary and capricious.

AR-000582-AR-000583.

### 2.    The Plaintiff's Claims for Short-Term and Long-Term Disability Benefits

Starting on June 1, 2006, FedEx Tech Connect, Inc. ("FedEx Tech Connect") employed the plaintiff as a senior customer services representative.  Am. Compl. at ¶ 6; Aetna's Answer at ¶ 6; Def. Federal Express Corp. Long Term Disability Plan's Answer to Am. Compl. ("FedEx LTD Plan's Answer") at ¶ 6, Doc. No. 20.   The plaintiff's employment with FedEx Tech Connect ended on July 27, 2011.  Perrine Decl. at ¶ 8.[9]

During the plaintiff's employment with FedEx Tech Connect, she was a Covered Employee under the LTD Plan.  *See* Am. Compl. at ¶ 8; Aetna's Answer at ¶ 8; FedEx LTD Plan's Answer at ¶ 8; *see also* AR-000001-AR-000002 (recognizing that the plaintiff was a

---

[8] The Notice of Denial must contain, *inter alia*, "the specific reason or reasons for the denial."  AR-000577.
[9] As with the court's brief references to the pleadings here, the court references Mr. Perrine's declaration here purely for background purposes.

Covered Employee).  As a Covered Employee, the plaintiff was entitled to Disability Benefits if she incurred a Disability as defined by the LTD Plan.  AR-000546-AR-000547.

### 3. The Plaintiff's Medical History During Her STD and LTD Occupational Disability Periods from July 28, 2008, Through January 25, 2011 as Contained in the Administrative Record

The plaintiff was admitted to the Horsham Clinic on or about July 21, 2008.  AR-000053-AR-000055.  While there, medical personnel diagnosed the plaintiff with, *inter alia*, depression and sleep disorder.  AR-000053.  The clinic discharged the plaintiff on July 31, 2008.  *Id.*

Aetna approved the plaintiff's claim for short-term disability ("STD") benefits under the Federal Express Short Term Disability Plan ("STD Plan") and she started receiving benefits on July 28, 2008.  AR-000001, AR-000004, AR-000005, AR-000006.[10]  On August 11, 2008, Elaine Martin MA/LPC completed a "Behavioral Health Clinician Statement" for Aetna.  AR-000051-AR-000052.  Ms. Martin recommended that the plaintiff not return to work as of August 5, 2008, because of depression, anxiety, poor concentration, and poor sleep.  *Id.*  Ms. Martin also noted that the plaintiff suffered from panic attacks once or twice per week.  AR-000051.

Between October and December 2008, Dr. Richard Schlessel, a psychiatrist, completed three "Behavioral Health Clinician Statement – Update[s]" for Aetna.  AR-000045-AR-000050, AR-000355.  The October 17, 2008 and November 17, 2008 statements noted diagnostic impressions of, *inter alia*, fibromyalgia and major depressive disorder.  AR-000048, AR-000050.  They also noted that the plaintiff suffered from panic attacks.  AR-000047, AR-000049.  The December 29, 2008 statement included diagnostic impressions of bipolar disorder and fibromyalgia, and Dr. Schlessel indicated that the plaintiff was unable to return to work.  AR-000046.

---

[10] *See also* Am. Compl. at ¶ 9; Aetna's Answer at ¶ 9; FedEx LTD Plan's Answer at ¶ 9.

The plaintiff exhausted her 26 weeks of STD benefits under the STD Plan on January 25, 2009.  AR-000006; *see* AR-000391 (indicating in SPD that STD benefits under STD Plan last up to 26 weeks).[11]  Aetna approved for the plaintiff to receive LTD benefits for an Occupational Disability under the terms of the LTD Plan on January 26, 2009.  AR-000001, AR-000006.[12]

Between February and August 2009, Ms. Martin and Dr. Schlessel completed five more Behavioral Health Clinician Statements.  AR-000082-AR-000089, AR-000091-AR-000092.  These statements continually diagnose the plaintiff with major depressive disorder, anxiety, and indicate that she experienced panic attacks.  AR-000082-AR-000089, AR-000091-AR-000092.  The statements also frequently describe the plaintiff as tearful, anxious, nervous, and depressed, and they note that she experienced mood swings and occasional hallucinations.  AR-000082-AR-000089, AR-000091-AR-000092.  All of the statements reference a diagnosis of fibromyalgia and Ms. Martin's statements on February 9, 2009, and May 6, 2009, also reference a diagnosis of arthritis.  AR-000087, AR-000092.

On June 21, 2009, the Social Security Administration ("SSA") issued a notice of award to the plaintiff.  AR-000019.  The SSA indicated that the plaintiff was entitled to disability benefits beginning in January 2009.  *Id.*  As such, the SSA informed the plaintiff that she would receive $7,635.00 on or around June 27, 2009, which would cover the past-due benefits for January 2009 through May 2009.  *Id.*  The award also indicated that the plaintiff would receive a monthly disability benefit of $1,527.00 starting in June 2009.  *Id.*  The SSA did not inform the plaintiff of the basis for the award.  *Id.*

The plaintiff had arthroscopic surgery on her right knee on October 29, 2009, at the Holy Redeemer Hospital and Medical Center.  AR-000080.  Todd Schwartz, DO, performed the

---

[11] *See also* Am. Compl. at ¶ 9; Aetna's Answer at ¶ 9; FedEx LTD Plan's Answer at ¶ 9.
[12] *See also* Am. Compl. at ¶ 12; Aetna's Answer at ¶ 12; FedEx LTD Plan's Answer at ¶ 12.

surgery, which also included a partial lateral meniscectomy, chondroplasty lateral tibial plateau, and chondroplasty of the undersurface of the patella.  *Id.*  The postoperative diagnoses included: (1) osteoarthritis grade 2-3 of the patellofemoral joint, (2) osteoarthritis grade 2-3 of the lateral hemijoint, (3) osteoarthritis grade 1-2 of the medial hemijoint, and (4) lateral meniscal degeneration.  *Id.*  The notes from the surgery indicate that the plaintiff tolerated the procedure well and there were no complications.  AR-000080-AR-000081.

After the surgery, Dr. Schwartz saw the plaintiff again on November 10, 2009.  AR-000077.  According to Dr. Schwartz's progress notes, the plaintiff's right knee was healing well and she had full range of motion.  *Id.*  The right knee still had pain, but it did not have effusion, synovitis, or erythema.  *Id.*  There was a positive McMurray sign.  *Id.*  There was also no laxity with varus-valgus stress.  *Id.*  Dr. Schwartz's impressions were (1) a medial meniscal tear of the left knee, (2) osteoarthritis of the left knee, and (3) "S/P arthroscopy of the right knee with lateral meniscectomy and osteoarthritis."  *Id.*  Dr. Schwartz recommended that the plaintiff continue her home exercise program, take anti-inflammatories, and wear a brace as needed.  *Id.*

During this November 10, 2009 visit with Dr. Schwartz, the plaintiff indicated that she wanted to undergo arthroscopy of her left knee because the injection that she received for the pain in her knee provided minimal improvement.  *Id.*  On November 20, 2009, Dr. Schwartz performed arthroscopic surgery in the form of a meniscal debridement of degenerative rim medially and laterally and a debridement of hypertropic synovium on the plaintiff's left knee.  AR-000078.   The plaintiff's postoperative diagnosis indicated osteoarthritis grade 2-3 patellofemoral and osteoarthritis grade 2-3 of the medial hemijoint.  *Id.*  As with the surgery on her right knee, the plaintiff tolerated the procedure well and there were no complications.  AR-000078-AR-000079.

14

On December 9, 2009, a Dr. Hartman prepared a Behavioral Health Clinician Statement for Aetna.  AR-000075-AR-000076.  Dr. Hartman's report indicated that he recommended that the plaintiff stay home from work because of anxiety, posttraumic stress, and depression.  AR-000075.  In addition, Dr. Hartman noted that the plaintiff reported to him that she suffered from panic attacks and had hallucinations.  *Id.*  Dr. Hartman indicated that the plaintiff was tearful, hopeless, had difficulty sleeping, and was shaking.  *Id.*  He further noted as diagnostic impressions that the plaintiff had fibromyalgia and had undergone knee surgeries.  AR-000076.

The plaintiff had a cervical MRI performed at Abington Memorial Hospital on January 26, 2010.  AR-000063.  The MRI showed "small osteophytes[,] severe disc degeneration at C5/C6 and moderate disc degeneration from at [sic] C6/C7."  *Id.*  The doctor's impression was "at C5/C6 there is mild disc bulging and hypertrophy of the uncovertebral joints but no stenosis or neural canal encroachment."  *Id.*

On January 27, 2010, the plaintiff saw Dr. Schwartz again.  AR-000074.  Dr. Schwartz noted that the plaintiff had an unsteady gait and had expressed experiencing increasing pain in both of her knees.  *Id.*  She had also been falling on her knees, which further aggravated the pain.  *Id.*  Dr. Schwartz stated that the plaintiff "was doing quite well after the arthroscopies, but the consistent falling on the knees made them significantly worse."  *Id.*  The plaintiff informed Dr. Schwartz that she saw a neurologist for her consistent falls.  *Id.*

Dr. Schwartz's physical examination showed no effusions, edema, or ecchymosis on the plaintiff's knees.  *Id.*  There was mild synovitis, but no laxity in the varus/valgus planes.  *Id.*  Although the plaintiff had full range of motion, she had mild crepitation with motion.  *Id.*  Dr. Schwartz's impression was that the plaintiff had osteoarthritis in both knees.  *Id.*  With the plaintiff's consent, Dr. Schwartz injected steroids into both knees.  *Id.*  He also recommended

that the plaintiff take anti-inflammatories, wear her braces, take pain medication, and continue her evaluation with her neurologist.  *Id.*

On February 24, 2010, the plaintiff saw Dr. Schwartz for another examination.  AR-000073.  The plaintiff indicated that she had mild improvement from the steroid injections, but it lasted for only two weeks and she was 65% improved.  *Id.*  She explained that she experienced most of the pain underneath her kneecaps, and she was having difficulty walking.  *Id.*

Dr. Schwartz's physical examination showed that the plaintiff had (1) crepitation with motion in her right knee, (2) no laxity in the varus-valgus planes in her right knee, (3) tenderness medially at the patellofemoral joint in both knees, (4) no lesions, edema, or ecchymosis on her left knee, (5) full range of motion of her left knee, and (6) anatomic alignment in both knees.  *Id.*  He continued to note that she had osteoarthritis in both knees.  *Id.*  He also recommended viscoelastic injections.  *Id.*

The plaintiff had a lumbar MRI performed on March 18, 2010.  AR-000065.  The MRI report noted that the plaintiff had a clinical history of mid to low back pain radiating into both legs.  *Id.*  The MRI revealed "[l]umbar spondylosis, but no significant spinal stenosis" and "central to right-sided disc protrusion at the L5-S1 level, but no encroachment upon the thecal sac or S1 nerve root sleeves."  *Id.*

The plaintiff had an "Initial Psychiatric Evaluation" on July 8, 2010.  AR-000071-AR000072.  While somewhat difficult to read, the evaluation form mentions the plaintiff's past diagnosis of depression and anxiety, and suggested treatment options which the plaintiff refused.  *Id.*

The plaintiff received a letter from Avonda Yearwood ("Yearwood") of Aetna dated July 28, 2010, informing her that Aetna was conducting a periodic review of her disability.  AR-000094.  The letter stated that her Occupational Disability benefits were in effect until January

25, 2011. *Id.* After that date, the letter informed the plaintiff would only continue to receive disability benefits if she met the LTD Plan's definition of Total Disability. *Id.*

The letter instructed the plaintiff to submit medical evidence that clearly showed significant objective findings that would substantiate a Total Disability. *Id.* The letter provided the applicable definitions of Total Disability and "significant objective findings," noting that pain, without significant objective findings, is not proof of disability. *Id.* The letter also advised her that physician examination reports, office and progress notes, other provider reports, and diagnostic studies were required to substantiate her disability. *Id.*

The letter further advised the plaintiff that

[a]s your case manager, I will also pursue medical information from your various providers. To ensure I have the most current information, please contact me with the names of all your treating providers and their phone numbers, along with your last and next scheduled appointment dates. Even though I will request medical information from your treating providers, it remains your responsibility to ensure proof of disability is provided by you or your treating providers.

AR-000095.

Dr. Douglas Sutton saw the plaintiff for a follow-up visit on August 25, 2010. AR-000067-AR000068. During this visit, the plaintiff indicated that the injections she received did not provide her with relief and she was having back pain in addition to buttock and radial right leg pain. AR-000067. She also indicated that although she had some symptoms with her left leg, the symptoms with her right leg were more limiting. *Id.*

Dr. Sutton's physical exam showed "paraspinal tenderness with restricted motion in all planes of the lumbar spine." *Id.* The plaintiff had "a positive straight leg raising, but no focal weakness." *Id.* Dr. Sutton indicated that the plaintiff's MRI showed

an enlarged herniation now with an extruded component at L5-S1 with a large extruded component behind the S1 vertebral body consistent with her symptoms. There is some disc degeneration and decussation at the remaining discs, but she

has now an extruded fragment, which does represent a new finding on this most
recent MRI.

*Id.* In addition, the plaintiff's standing x-rays showed "no evidence of any spondylolisthesis or scoliosis." *Id.* Based on his exam, Dr. Sutton's impressions were that the plaintiff had a herniated lumbar disc, L5-S1, and lumbar radiculopathy. *Id.* Dr. Sutton and the plaintiff discussed various options, with the plaintiff preferring to have surgery in the nature of a microdiscectomy. *Id.*

Dr. Sutton reevaluated the plaintiff on September 23, 2010. AR-000060. From Dr. Sutton's notes, the plaintiff had a microdiscectomy approximately three weeks prior to this visit. *Id.* Dr. Sutton observed that although the plaintiff had some numbness on the outer aspect of her right foot, her radicular pain seemed improved from her preoperative condition. *Id.* He noted that the plaintiff had some buttock and leg pain on the left side. *Id.* Regarding the surgery, Dr. Sutton observed that the incision was well healed and there was no infection, drainage, or erythema. *Id.* The plaintiff had good gross motor strength for the major muscle groups of both lower extremities. *Id.* In addition, the plaintiff's reflexes were symmetric at her knee and ankle, and she had some minor lymphedema. *Id.* Dr. Sutton's impressions were (1) herniated lumbar disc, (2) "S/P lumbar discectomy," and (3) "R/O recurrent herniation." *Id.* Dr. Sutton recommended that the plaintiff treat her symptoms with a "Medrol Dosepak in the event her symptoms are inflammatory in nature." *Id.* If the plaintiff did not improve, she would have to undergo another MRI to look for signs of recurrent herniation or epidural scarring. *Id.*

Dr. Ian Magill, a psychiatrist, prepared a Behavioral Health Clinician Statement for Aetna on September 28, 2010. AR-000069-AR000070. Dr. Magill's report indicated that the plaintiff was depressed and cries "often and easily." AR-000069. The plaintiff once again reported hallucinations and that she experienced panic attacks. *Id.* Dr. Magill's diagnostic

impression was that the plaintiff suffered from bipolar affect disorder with psychotic features. AR-000070.   He also noted that she suffered from vertigo and hypertension and that she experienced lumbar disc pain.  *Id.*

The plaintiff submitted to another lumbar MRI on October 22, 2010.  AR-000064.  The MRI report indicated that the plaintiff's lumbar spinal canal was developmentally normal in size, and there was "disc desiccation with mild to moderate disc narrowing at L5-S1."  *Id.*  The report also indicated that, "post recent discectomy at L5 on the right," there was "enhancement of granulation tissue at the surgical site with no evidence of recent disc herniation."  *Id.*  In addition, there was no evidence of a pathologic fluid collection.  *Id.*  Further, there was moderate degenerative change in the facet joints with no evidence of spinal stenosis.  *Id.*

The plaintiff spoke to Dr. Sutton on the telephone on October 28, 2010, concerning her recent MRI.  AR-000060.  According to his notes, Dr. Sutton reported that the MRI suggested postop changes at L5-S1, with mild to moderate disc space narrowing at L5-S1.  *Id.*  Although the report suggested enhancing granulation tissue at the surgical site, there was no evidence of recurrent disc herniation or pathologic fluid collection.  *Id.*  The plaintiff continued to experience sciatic pain, so Dr. Sutton recommended a caudal epidural to treat the pain.  *Id.*

On November 8, 2010, the plaintiff again visited with Dr. Sutton.  AR-000057-AR-000058.  The plaintiff indicated that she was still "having back and radicular leg pain, but also having a lot of neck, upper back, and radicular arm pain and paresthesias."  AR-000057.  Although she was participating in physical therapy, it did not provide her with any relief.  *Id.*  Dr. Sutton conducted a physical examination of the plaintiff, which revealed some limited motion in the flexion, extension, and rotation of the cervical spine.  *Id.*  He noted some paraspinal tenderness, but no spasms. *Id.*  He also noted that the plaintiff had good gross motor strength for her upper extremities and her reflexes were symmetric with no long tract signs or lymphedema.

19

*Id.*  In addition, her lumbar incision was well healed and there were no focal or neurologic deficits for the lower extremities.  *Id.*

Dr. Sutton also reviewed the MRI of the plaintiff's lumbar spine.  *Id.*  He noted that there were postop changes, but there was no evidence of any "large recurrent herniations or disc disease throughout the lower lumbar spine."  *Id.*  He further noted that there were spondylitic changes in the cervical spine, which were causing "narrowing both centrally and in the neural foramen at the 5-6 and 6-7 levels.  [Also, i]t seem[ed] to be worse at the 5-6 level."  *Id.*  He did not observe any frank cord compression or myelomalacia.  *Id.*  Dr. Sutton's impressions were (1) lumbar radiculopathy, (2) "S/P lumbar discectomy," and (3) cervical spondylosis with radiculopathy.  *Id.*  He recommended epidural injections, and indicated that he and the plaintiff would discuss surgical options after reviewing how she responded to the epidural injections.  *Id.*

On November 12, 2010, Yearwood spoke with the plaintiff, who indicated that she was going to get two injections in her back and that she believed that Dr. Sutton was keeping her out of work.  AR-000238.  The plaintiff was to inform Yearwood if Dr. Sutton was one of her disabling providers.  *Id.*  Yearwood faxed and contacted Dr. Sutton's office to advise him to complete a Total Disability Any Occupation ("TDAO") physician's report.  AR-000240; Decl. of Robin L. Marsh ("Marsh Decl.") at Ex. 1, AR SUPP 001, Doc. No. 40.

On November 17, 2010, Yearwood indicated that she received (1) notes from Dr. Sutton dated August 25, 2010, September 23, 2010, October 28, 2010, and November 8, 2010, (2) a MRI report of the cervical spine dated January 26, 2010, (3) a MRI of the lumbar spine dated October 22, 2010 and March 18, 2010, and (4) a TDAO physician report from Dr. Sutton dated November 16, 2010.  AR-000239; Marsh Decl. at Ex. A, AR SUPP 001-AR SUPP 011.  With regard to Dr. Sutton's TDAO physicians report, he appears to have signed a report, dated November 16, 2010, in which he checked a box indicating that "Ms. Bechter is unable to work at

any compensable employment for a minimum of twenty-five hours per week." Marsh Decl. at Ex. A, AR SUPP 002. The aforementioned notes and reports were attached to the TDAO report. Marsh Decl. at Ex. A, AR SUPP 003-AR SUPP 011.

On or about November 17, 2010, Aetna referred the plaintiff's claim for benefits under the LTD Plan to Dr. Donald Getz, a board certified orthopedic surgeon, for peer review of the clinical data in her file. AR-000099-AR000103. Dr. Getz prepared a report dated November 29, 2010, in which he indicated that he considered (1) Dr. Schwartz's office visit notes dated November 10, 2009, December 9, 2009, January 27, 2010, and February 24, 2010, (2) Dr. Sutton's office visit notes dated August 25, 2010, September 23, 2010, October 28, 2010, and November 8, 2010, (3) a physician report from Dr. Sutton dated November 16, 2010, (4) operative reports dated October 29, 2009 and November 20, 2009, (5) a MRI of cervical spine dated January 26, 2010, and (6) MRIs of lumbar spine dated March 18, 2010, and October 22, 2010. AR-000100. He also summarized her medical and treatment history as evidenced by the above reports. AR-000100-AR-000102.

Dr. Getz indicated that the documentation did not provide "adequate objective data to determine the patient as being functionally impaired from engaging in any compensable employment for a minimum of 25 hours per week." AR-000102. In supporting this conclusion, he stated as follows:

> The claimant has been diagnosed with osteoarthritis of bilateral knees status post arthroscopy and debridement of left knee and status post arthroscopy, chondroplasty, and lateral meniscectomy of right knee. She has had cervical and lumbar spondylosis and is status post microdiscectomy of the lumbar spine. [Her l]ast physical examination with Dr. Sutton revealed the claimant had some limited range of motion with cervical flexion, extension, and rotation. There was some paraspinal tenderness noted, but no muscular spasms. She had symmetrical reflexes with no motor / sensory compromise on examination of bilateral upper and lower extremities. There was no date from Dr. Schwartz about the claimant's postsurgical functional status. Therefore, given the lack of medical documentation, functional impairment cannot be supported that would preclude

the claimant from performing the physical demands of compensable employment for a minimum of 25 hours per week.  Therefore, there is no need for work restrictions or reduction in work schedule.

*Id.*

The plaintiff received a letter dated December 17, 2010 from Yearwood, in which Yearwood indicated that Aetna had denied the plaintiff's claim for Total Disability benefits under the LTD Plan.  AR-000008-AR000009.  The letter stated that Aetna had reviewed all of the documentation submitted (the same documentation Dr. Getz indicated that he reviewed), and it had obtained a peer review of her records.  AR-000008.  Aetna indicated that it concluded that there were "insufficient objective findings to support a disability" for the following reasons:

> [Y]ou have been out of work with bipolar disorder, herniated lumbar disc for which you underwent a lumbar discectomy and arthritis of both knees for which you underwent arthroscopic surgery on both.  Following your back surgery you continued to have complaints of pains in your lower and upper back for which you received multiple injections.  On 10/22/10 you had a lumbar MRI performed which revealed you did not have a recurrence of the herniated disc.  Your last office visit notes from Dr. Sutton noted you were having pains in the lower back, neck and arm.  Your physical examination findings showed you had good strength in your upper arms and legs, and some reduced movement in your cervical spine.
>
> There is no evidence of any significant orthopedic or neurological deficits in the submitted documentation.  In addition, there are no current physical examination findings to indicate impairments that would prevent you from sitting, standing, walking or lifting up to ten pounds. . . . With regard to your mental and nervous condition, the [LTD Plan] states disability benefit [sic] paid due to a mental impairment cease [sic] after twenty four months.

AR-000008-AR-000009.

On December 22, 2010, Dr. Magill created a note stating that the plaintiff was unable to return to work at that time.  AR-000056.  In addition, there was a note from Jacquie Coyle, LCSW, indicating that the plaintiff had been seeing her for psychotherapy since August 4, 2010, and the plaintiff continued to see Dr. Magill.  *Id.*  Ms. Coyle pointed out that Dr. Magill gave the plaintiff a note stating that the plaintiff was not able to return to work at that time.  *Id.*

**4.      The Plaintiff's Appeal of the Denial of Benefits and Post-January 25, 2011 Medical Documentation**

On or about December 27, 2010, the plaintiff appealed the denial of her claim for Total Disability benefits.[13]  AR-000010-AR-000020.  In the appeal letter, the plaintiff indicated that she was in excruciating pain despite all of her injections and lumbar spine surgery.[14]  AR-000012.  She also stated that she was scheduled for cervical spine surgery on January 11, 2011. *Id.*

Aetna acknowledged the appeal via letter dated January 28, 2011.  AR-000096.  Aetna instructed the plaintiff to submit any additional documentation in support of her appeal.  *Id.* Between January 21, 2011, and March 2, 2011, the plaintiff submitted additional information for consideration of her appeal of the denial of her claim for Total Disability benefits.  AR-000022-000039.

Among the additional information the plaintiff submitted was a report by Dr. Amy Fitzsimmons, who was affiliated with Physical Medicine and Rehabilitation.  AR-000038-AR-000039.  Dr. Fitzsimmons saw the plaintiff on February 3, 2011.  *Id.*  In Dr. Fitzsimmons' notes from that visit, she recounted the plaintiff's medical history, including, *inter alia*, her two arthroscopic knee surgeries in 2009, her back surgery in 2010, her recent cervical fusion surgery

---

[13] It is unclear from the administrative record when the plaintiff filed the appeal.  The letter indicating that the plaintiff is appealing is dated December 27, 2010.  AR-000012.  Nonetheless, the fax cover sheet containing the appeal letter is dated January 21, 2011.  AR-000011.  The court's resolution of this issue is rendered more difficult by the parties' submissions, as they both agree to each other's differing representations of when the plaintiff filed the appeal.  *See* Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. at ¶ 46 (stating that the plaintiff appealed from the denial of her LTD Total Disability benefits on January 21, 2011), Doc. No. 30; Pl.'s Reply to Defs.' Undisputed Material Facts in Supp. of Their Mot. for Summ. J. at ¶ 46 (stating that the fact of the filing and date of filing of the plaintiff's appeal is undisputed), Doc. No. 34; Pl.'s Statement of Undisputed Material Facts in Supp. of Pl.'s Mot. for Summ. J. at ¶ 37 (stating that the plaintiff appealed from Aetna's denial of her LTD Total Disability benefits on December 27, 2010), Doc. No. 32; Defs.' Resp. to Pl.'s Mot. for Summ. J. at ¶ 37 (stating that plaintiff's statement in paragraph 37 of her undisputed material facts is "[n]ot disputed for purposes of this motion").  Regardless of these discrepancies, the timing of the appeal has no bearing on this case as it appears that the plaintiff filed a timely appeal.

[14] In an undated list, the plaintiff indicated that, among other medication, she was taking Skelexin, Percocet and Vicodin for pain.  AR-000017.

in January 2011, the multiple injections in her neck and low back, the epidurals, facet blocks, and sacroiliac joint blocks.  AR-000038.  The plaintiff complained of having pain that goes all the way from the left side of her buttocks and into her foot with accompanying numbness and tingling.  *Id.*  She also had pain across her shoulders and numbness and tingling into her left arm and hand.  *Id.*  She had experienced some dizziness.  *Id.*  The plaintiff also had an "impressive rash" that she had for approximately 18 months, but had not shown her primary care physician. *Id.*

During Dr. Fitzsimmons' physical examination, she noted that the plaintiff (1) was well nourished and overweight, (2) was able to ambulate into the office without acute distress, (3) could sit and rise with relative ease, (4) had the aforementioned rash on her abdomen (where it was severe), on the back of her legs around the calves, at the top of her feet, and in the area of her face, (5) decreased sensation to light touch in the left lateral leg and the left lateral foot, (6) had reflexes at "2/2 at both knees, 0/2 at both ankles," (7) marked atrophy of the right extensor digitorum brevis compared to that of the left side, and (8) could get from a supine to a prone position and vice versa with relative ease.  AR-000039.  The plaintiff's manual muscle testing was "4 to 4+/5 bilaterally and symmetric."  *Id.*  Dr. Fitzsimmons' impression was that the plaintiff "has possible lumbosacral radiculopathy, possible peripheral nerve entrapment, possible peripheral neuropathy secondary to metabolic problem or vasculitis."  *Id.*  Dr. Fitzsimmons' plan was to have the plaintiff undergo electrodiagnostic testing.[15]  *Id.*

On February 11, 2011 and February 23, 2011, Dr. Sutton gave the plaintiff an "out-of-work" note stating that she was under his care and is "totally disabled until healed."  AR-000025,

---

[15] It appears that the plaintiff underwent electrodiagnostic testing with Dr. Fitzsimmons on that same date.  AR-000030-AR-000031.  The report from this test is unsigned (although it has a signature line for Dr. Fitzsimmons). AR-000031.  Dr. Fitzsimmons apparent conclusions from the testing were (1) "marked axonal peripheral neuropathy affecting the peroneal and sural nerves," and (2) a pronounced red rash over her abdomen, back of legs, and top of feet.  *Id.*

AR-000027.  The note indicated that the plaintiff would be disabled for four to six months.  AR-000025, AR-000027.

On March 3, 2011, Aetna received a telephone call from the plaintiff.  AR-000098, AR-000256-AR-000257.  During the call, the plaintiff advised Aetna that she would not be submitting any additional clinical information in support of her appeal.  AR-000098, AR-000256-AR-000257.  Aetna confirmed the data it had on file.  AR-000257.

On or about March 9, 2011, Aetna referred the plaintiff's claim for Total Disability benefits under the LTD Plan to Dr. Lawrence Blumberg, who was board certified in orthopedic surgery, for a peer review of the clinical data in the plaintiff's file, including the additional data she submitted.  AR-000104-AR-000107.  Dr. Blumberg listed the clinical data he reviewed, which included the plaintiff's MRIs and electrodiagnostic test results, Dr. Fitzsimmons' February 3, 2011 letter, and Dr. Sutton's February 23, 2011 "out-of-work" note.  AR-000104-AR-000105.  It appears from Dr. Blumberg's report that he did not review any progress notes from Dr. Sutton from 2010, nor the TDAO report from November 16, 2010.  AR-000104-AR-000107.

Dr. Blumberg recapped the plaintiff's treatment and clinical history.  AR-000105-AR-000106.  Dr. Blumberg concluded that "[b]ased on the documentation, there is no significant objective documentation that reveals a functional impairment that would preclude the claimant from engaging in any compensable employment for a minimum of 25 hours per week."  AR-000106.  He also stated that

> [t]he Medical Disability Advisor advises that for a cervical fusion the maximum allowable time to be out of work would be 84 days.  The optimal is 49 days and minimum is 42 days.  By 3/14/11, the claimant was 62 days postoperative.  The physical examination findings of 2/3/11 did not reveal a pathologic condition that would preclude any occupational activities.  There is no evidence the claimant cannot stand, sit, or ambulate.  There is no evidence the claimant cannot use her

upper extremities.  She is, therefore, capable of any occupational activities for a minimum of 25 hours per week as of 3/14/11.

*Id.*

On April 13, 2011, Dr. Blumberg amended his report to adjust the timeframe recommended by the Medical Disability Advisor.  AR-000108-AR-000111.  It appears that he relied upon the same records in preparing the amended report as he had in his original report.  AR-000108-AR-000109.  Dr. Blumberg pointed out that his original report reflected the timeframe for a lumbar fusion, rather than a cervical fusion of the type that the plaintiff had in January 2011.  AR-000110.  Dr. Blumberg's amended report noted that the Medical Disability Advisor advises that for a cervical fusion, the maximum allowable time to be out of work would be 42 days.  *Id.*  The optimal time to be out of work is 21 days, and the minimum is 7 days.  *Id.*  Dr. Blumberg stated that by February 23, 2011, the plaintiff was 42 days postoperative, which was the maximum allowable time to be out of work.  *Id.*

Based on a review of the information the plaintiff submitted in support of her appeal, in a letter dated April 13, 2011, Aetna reinstated her LTD benefits for the period of January 26, 2011, through March 13, 2011, but upheld the denial of her claim for Total Disability benefits under the LTD Plan from March 14, 2011 forward.  AR-000001-AR-000002.  The letter stated that "[e]ach Committee member received and read a copy of the entire administrative record which contains all information submitted with your appeal including the Case Management notes, all medical documentation, your appeal letter, the Peer Physician Reviews dated 11/29/10 and 03/15/11, the Plan document, and the YEB."  AR-000001.

In the letter, Aetna summarized the plaintiff's medical history and explained that

you went out of work due to disk [sic] degeneration, MRI performed on 01/26/10 of your neck revealed several osteophytes and disk [sic] degeneration.  MRI's performed on 03/18/10 and 10/22/10 of your lower back revealed no significant spinal stenosis and no evidence of disk [sic] herniation.  On 10/29/10 [sic] you

26

underwent arthroscopy of the right knee with a partial lateral meniscectomy. Follow-up visit on 11/29/10 [sic] noted you had no impairment of the knee.  On 01/11/11 you underwent cervical spine surgery.  Electrodiagnostic studies were performed on 02/03/11.  Physical examination on 02/03/11 noted you were able to ambulate although there was decreased sensation to light touch in the left lateral leg and left lateral foot.  Reflexes and manual motor testings were normal.  A work status note on 02/23/11 stated you were under his care for spinal surgery and were totally disabled for four to six months.  EMG testing revealed nerve damage in both your legs, however there were no significant examination findings to support your disability.  Although Dr. Sutton indicated you were disabled for four to six months, there were no clinical examination findings to support a continued disability beyond 03/13/11.  There is no evidence you were unable to use your upper extremities, stand, sit or ambulate.  Pursuant to the [LTD Plan] the disability ceases after 24 months for a mental or nervous condition.  Therefore there was no documentation submitted indicating any pathological condition that would preclude you from engaging in any compensable employment for 25 hours per week.

AR-000002.

Aetna also stated that "[t]he Committee considered all submitted documentation, noted the conclusions of the peer physicians, and determined that there are no significant objective findings to substantiate that a functional impairment exists that would preclude work in any compensable employment for [25] hours per week."  *Id.*  It further indicated that "[t]he Plan is specific regarding the requirement of significant objective findings to substantiate eligibility for Total Disability benefits, and this requirement was not met in this case."  *Id.*

### C.    Analysis

Because the court is reviewing cross-motions for summary judgment, the court will briefly summarize the parties' contentions.  In her motion for summary judgment, the plaintiff contends that Aetna's decision to deny her LTD benefits under the Total Disability portion of the LTD Plan was arbitrary and capricious because:  (1) Aetna arbitrarily failed to address her complaints of pain, insofar as those complaints were substantiated by significant objective findings in the record, on her ability to work at least 25 hours per week at any compensable employment; (2) the administrative record contained significant objective findings to support a

conclusion that she was under a Total Disability in the nature of degenerative changes and osteoarthritis in her knees, enhancing granulation tissue located near the surgical site in her back, and peripheral neuropathy in her legs; (3) the process itself suffered from numerous procedural abnormalities, including:  (a) Aetna relying on only selected portions of the record in denying her benefits; (b) Aetna failing to consider and address the TDAO report by Dr. Sutton in which he indicated that she was totally disabled; (c) Aetna declining to undertake efforts to obtain documents that were obviously missing from the record; (d) Aetna relying on the opinions of its non-treating, peer review doctors rather than on her treating physicians; and (e) Aetna failing to order an independent medical examination of her despite having discretion to do so under the LTD Plan.  Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") at 14-22, Doc. No. 32.[16]

In the defendants' motion for summary judgment, they generally point out that Aetna's decision to deny the plaintiff's claim for Total Disability LTD benefits was not arbitrary or capricious because it was supported by substantial evidence in the record.  Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 16-18, Doc. No. 31.  In this regard, they assert that the plaintiff's subjective complaints of pain were insufficient to support a finding of a Total Disability as her complaints of pain were not supported by objective medical evidence in the record.  *Id.* at 14.  They also note that the plaintiff's history of emotional and mental issues and the fact that she receives social security disability benefits were (and are) irrelevant to whether she was entitled to Total Disability LTD benefits.  *Id.* at 7-8, 15-16.  They further argue that while the medical records demonstrated that the plaintiff's medical professionals diagnosed her with osteoarthritis in both knees, and issues with her back and neck, her physical

---

[16] The plaintiff's memorandum of law is combined with her statement of undisputed material facts and the court has referred to the pages in the entire document when citing to the plaintiff's memorandum contained therein.

examinations did not show any medical conditions that would have prevented her from working 25 hours per week.  *Id.* at 8-11.  They lastly assert that the two peer review medical reports substantiated Aetna's conclusion that there was a lack of significant objective findings of a Total Disability.  *Id.* at 11-14.

Before addressing the parties' contentions, the court notes the following:  First, as indicated above, the parties agree that the applicable standard of review in this case is the arbitrary and capricious standard.  *See* Defs.' Mem. at 3-5; Pl.'s Mem. at 13-14; Defs.' Resp. to Pl.'s Mot. for Summ. J. ("Defs.' Resp.") at 5; Pl.'s Resp. in Opp. to Defs.' Mem. of Law in Support of Pl.'s Mot. for Summ. J. ("Pl.'s Resp.") at 10.  Second, the parties agree that the plaintiff has the burden of showing that the defendants' denial of LTD benefits was arbitrary and capricious.  Defs.' Mem. at 6; Pl.'s Resp. at 10.  Third, the parties agree that the plaintiff's history of mental and emotional issues that initially led to her receiving STD benefits and LTD benefits under the Occupational Disability portion of the LTD Plan are irrelevant to the court's analysis about whether Aetna's decision that she was not suffering from a Total Disability was arbitrary and capricious.  *See* Pl.'s Mem. at 21 n.5 (acknowledging that although her mental disorder caused cognitive limitations, these limitations are "not compensable for total disability"); Defs.' Mem. at 8 (arguing that the plaintiff's mental impairments are excluded from the definition of a Total Disability under the LTD Plan).[17]  Finally, although the parties do not necessarily agree with each statement in their respective statements of undisputed material facts, those disputes related more to whether the particular statements contained all of the information from a  particular part of the LTD Plan documents or the administrative record and, occasionally,

---

[17] The plaintiff does not address the defendants' contention that her award of social security benefits is irrelevant to the court's analysis in this case.  Therefore, it appears that she concedes this argument to the defendants. Regardless, as the basis for the award is not in the record, and the timing of the award provides an inference that it was related to the plaintiff's mental health issues and not any physical issues; the award is irrelevant to the court's review of the defendants' decision in this case.

related to a characterization of the information contained in those documents.  In other words, the parties did not provide conflicting views of the record.  Thus, the court finds that there is no genuine issue of material fact that would preclude the entry of summary judgment for the prevailing party in this case.

### 1.     The Plaintiff's Arguments in Her Motion for Summary Judgment

Although the court is presented with cross-motions for summary judgment, the court will address those arguments presented in the plaintiff's motion as consideration of those arguments will also encompass the entirety of the defendants' arguments in support of their motion for summary judgment.[18]  As explained below, the court finds that there are no genuine issues of material fact as to whether the defendants acted arbitrarily and capriciously in denying the plaintiff's request for Total Disability benefits after March 13, 2011, and, thus, Aetna's decision was reasonable given the evidence in the administrative record.

### a.     The Plaintiff's Complaints of Pain and the Documentation Relating to Her Alleged Impairments

The plaintiff's first argument is that the defendants' failed to properly address the effects of her pain on her ability to work at any job for 25 hours per week.  Pl.'s Mem. at 14-18.  The record and the LTD Plan do not support this argument.

The plaintiff acknowledges that "unlike other LTD plans," the LTD Plan provides that she needs to substantiate her Disability by submitting documentation showing significant objective findings, and that her symptoms or complaints of pain, without those objective findings, are insufficient in themselves to establish a Disability under the LTD Plan.  *Id.* at 14-15.  Thus, to the extent that the plaintiff is arguing that the defendants acted arbitrarily and capriciously because they did not assess her complaints of pain on her ability to work, the LTD

---

[18] This discussion will also necessarily encompass arguments raised by the parties in response to their respective motions for summary judgment and the supplemental briefs filed with respect to Dr. Sutton's TDAO report.

Plan did not impose such a requirement on the defendants.  Instead, the complaints of pain had to be corroborated by significant objective findings that would establish a Disability.  Moreover, there is nothing in the record that any of the plaintiff's medical providers specifically concluded that she was unable to work 25 hours per week simply because of her pain.

The plaintiff also argues that her complaints of "debilitating" pain are supported by significant objective findings in the record.  *Id.* at 15.  In particular, the plaintiff focuses on the evidence in the record showing issues with three areas of her body:  Her knees, her back, and her neck.  *Id.*  The court will address each of these in turn.

With regard to her knees, the plaintiff points out that the record shows that she suffered from degenerative changes and osteoarthritis of both knees.  *Id.*  Also, despite surgery and treatment with injections, she notes that the record demonstrates that she continued to complain of pain in both knees and she exhibited crepitation in one knee and some medial tenderness in the other knee.  *Id.*

The defendants assert that although Dr. Schwartz diagnosed the plaintiff with osteoarthritis in both knees, he never placed her on any work restrictions because of her knees and there was nothing in the administrative record to show that she could not work 25 hours per week at any job because of the osteoarthritis in her knees.  Defs.' Mem. at 8-9.  In this regard, the defendants note that despite the osteoarthritis, Dr. Schwartz noted in February 2010 that the plaintiff had anatomic alignment in her knees and full range of motion.  *Id.* at 9.  They also assert that the plaintiff "only complained about continued pain in her knees but with no identifiable physiological cause for the pain."  *Id.*

Although the court agrees with the defendants that the administrative record contains substantial evidence to support their conclusion that the plaintiff's issues with her knees did not result in a Total Disability, their argument about her pain requires further discussion.  More

31

specifically, their contention that there was no objective finding of an impairment that would cause the plaintiff's pain is just wrong and unsupported by the record.  As the defendants acknowledge, Dr. Schwartz diagnosed the plaintiff with osteoarthritis and, although there is no documentation on this particular point, it would appear that this kind of impairment could cause the plaintiff to suffer continued pain.  It would also seem unfathomable that Dr. Schwartz would recommend that the plaintiff receive injections in her knees or direct her to take anti-inflammatory medication if she was not suffering from some sort of impairment and the only particular impairment he referenced after her surgeries was osteoarthritis.  So, contrary to the defendants' arguments, the issue presented with respect to the plaintiff's knees is not whether she has a documented impairment that could support her complaints of pain, but whether that impairment could constitute a significant objective finding sufficient to satisfy the Total Disability definition under the LTD Plan.

As to this issue, the administrative record contains substantial evidence to support Aetna's conclusion that the plaintiff's osteoarthritis did not cause her to have a Total Disability under the LTD Plan.  Other than the plaintiff's complaints of pain, there is no evidence in the record that the plaintiff could not sit, stand, walk, lift, or otherwise work because of her knees.  Similarly, although Dr. Schwartz noted crepitation in her right knee and any tenderness medially in a joint in her left knee, there is no indication in the record that this would cause her to not be able to work 25 hours per week in any compensable occupation.

In response to this lack of documentation in the record, the plaintiff points out that she was already receiving LTD benefits for an Occupational Disability when Dr. Schwartz was treating her and, as such, he would have had no reason to place her on any work-related restrictions at the time.  Pl.'s Resp. at 11.  The plaintiff also argues that although she understands the LTD Plan's requirement that she submit significant objective findings to support her claim

that she is totally disabled, it does not require her to submit information, such as the information typically contained in a residual functional capacity form, to substantiate her knee impairments. *Id.* at 11 & n.3.  Thus, there was no requirement that she provide reports from her medical providers concerning her ability to do such things as sit, stand, walk, and lift up to ten pounds. *Id.*

Admittedly, the court agrees with the plaintiff that at the time of his examinations and treatment, Dr. Schwartz would not have needed to place any work-related restrictions on the plaintiff because she was already receiving LTD benefits during this time.  Nonetheless, if the plaintiff is claiming that her knee issues are sufficient to establish a Total Disability, there has to be some evidence in the record to show that her knee impairments are sufficiently disabling under the LTD Plan to qualify her for a Total Disability.  With the exception of the plaintiff's complaints of pain, there are no significant objective findings that would support a determination that her knees prevented her from working 25 hours a week at any occupation.  In addition, while the LTD Plan does not require the plaintiff to submit the equivalent of a residual functional capacity form, and it does not appear that the defendants are stating that they needed that type of documentation, there had to be some evidence in the record of significant objective findings not simply showing that she could have pain, but that these findings showed that she was sufficiently disabled as to qualify her for a Total Disability.  It does not appear that the defendants ignored any such evidence in the record because there was no such evidence.  It also does not appear that Aetna disagreed with Dr. Schwartz's diagnosis of osteoarthritis or any of the other findings in his reports, but that Dr. Schwartz's lack of commentary on the possible disabling effect of the plaintiff's conditions was determinative.  Dr. Getz, Aetna's peer review physician, stated as such when he had thoroughly reviewed the plaintiff's medical records, including her treatment by Dr. Schwartz, and he noted that the plaintiff had not submitted any documentation from Dr.

33

Schwartz about her "postsurgical functional status." AR-000102. Moreover, although Dr. Schwartz diagnosed the plaintiff with osteoarthritis and noted granulation in her right knee and tenderness medially at the patellofemoral joint in both knees, his reports also indicate that the plaintiff had full range of motion in both knees and he believed that the plaintiff was doing well after the surgeries. AR-000073-AR-000074. Therefore, at the time of Aetna's initial denial of the plaintiff's LTD benefits, it had sufficient evidence in the record to conclude that she did not suffer from a Total Disability because of impairments with her knees.

As for Aetna's decision on appeal relating to the plaintiff's knees, the only additional documentation relating to her knees was provided through Dr. Fitzsimmons' February 3, 2011 report. In that report, Dr. Fitzsimmons discussed some of the plaintiff's history regarding her knees and noted that the plaintiff claimed to have "excruciating pain" behind her knees. AR-000038. Nonetheless, Dr. Fitzsimmons' physical examination of the plaintiff's knees showed that she was able to ambulate into the office without an issue, and her reflexes were 2/2 at both knees. AR-000039. While the plaintiff focuses on Dr. Fitzsimmons' reference to peripheral neuropathy in her legs as another basis to substantiate her complaints of pain, even if this is the case, there is nothing in the medical documentation showing that this impairment would have prevented the plaintiff from working 25 hours per week at any compensable occupation. Accordingly, Aetna's determination on appeal that the plaintiff's knee issues did not constitute a Total Disability under the LTD Plan was not arbitrary and capricious.

Regarding the plaintiff's back issues, she appears to focus on the enhancing granulation tissue found at the surgical site as evidenced in a MRI, as the significant objective finding to support her complaints of pain and a finding of a Total Disability. Pl.'s Mem. at 15. In addition, while also addressed as part of her procedural anomaly argument, she references Dr. Sutton's TDAO report indicating that she suffered from a Total Disability. *Id.* at 19.

The documentation in the administrative record showed that the plaintiff was complaining of pain in her lower back, which radiated to her buttocks and legs. A March 2010 MRI revealed degenerative changes in the plaintiff's spine and a mild disc protrusion at L5-S1. The plaintiff started visiting with Dr. Sutton and she eventually underwent a microdiscectomy. Approximately three weeks after the procedure, Dr. Sutton observed that, *inter alia*, the plaintiff's pain levels had decreased, she had good gross motor strength for the major muscle groups of her lower extremities, and her reflexes were symmetric. On or around November 16, 2010, Dr. Sutton completed the TDAO report stating that it was his opinion that the plaintiff was unable to work at any compensable employment for a minimum of 25 hours per week.

Post-microdiscectomy, the administrative record is unclear as to the particular significant objective finding that would have constituted a Total Disability under the LTD Plan. The parties dispute whether the October 2010 MRI finding of postoperative granulation tissue at the surgical site could serve as the basis for her complaints of pain or was just a normal part of post-surgery recovery. *See* Pl.'s Mem. at 15 & n.2; Defs.' Resp. at 7 & n.1. Regardless, even if the enhancing granulation could serve as the basis for her pain, there is no evidence or documentation in the record to show that Dr. Sutton stated as such or why this postoperative granulation would have prevented the plaintiff from working at least 25 hours per week at any compensable position.

As for Dr. Sutton's TDAO report, it appears that although the report was reviewed by both Dr. Getz and Aetna prior to Aetna's initial denial of Total Disability LTD benefits, neither Aetna nor Dr. Getz specifically addressed Dr. Sutton's conclusion that the plaintiff's impairment(s) satisfied the definition of a Total Disability. Although Dr. Sutton was the plaintiff's treating physician for her back, "ERISA 'does not require that plan administrators give the opinions of treating physicians special weight, courts must still consider the circumstances

35

that surround an administrator ordering a paper review [from a non-treating physician].'"
*Connelly v. Reliance Standard Life Ins. Co.*, No. CIV.A. 13-5934, 2014 WL 2452217, at *5
(E.D. Pa. June 2, 2014) (quoting *Post v. Hartford Ins. Co.,* 501 F.3d 154, 166 (3d Cir. 2007)
(citation omitted) and also citing to *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831
(2003)).  Additionally,

> [p]lan administrators may not arbitrarily refuse to credit a claimant's reliable
> evidence, which may include a treating physician's opinion, but a court cannot
> "require administrators automatically to accord special weight to the opinions of a
> claimant's physician; nor may courts impose on plan administrators a discrete
> burden of explanation when they credit reliable evidence that conflicts with a
> treating physician's evaluation."

*Id.* (quoting *Nord,* 538 U.S. at 834).

Despite the checkmark on the TDAO report, nothing in Dr. Sutton's accompanying
medical documentation (his August 2010 through November 2010 notes) in terms of diagnoses
for any impairments that he had not treated supports a finding of a Total Disability.  This same
documentation does not specifically address what particular medical problem with her back that
the plaintiff suffered from and how it would have precluded her from working a minimum of 25
hours per week at any compensable job.  Because the basis for Dr. Sutton's conclusion of a Total
Disability was not evidenced by the medical documentation, Aetna was free to disregard it and
rely on the opinion of Dr. Getz, even though he did not personally evaluate the plaintiff, in
concluding that there was a lack of medical documentation to support a determination that the
plaintiff could not work in any occupation for a minimum of 25 hours per week.  Accordingly,
Aetna did not act arbitrarily or capriciously in initially denying Total Disability LTD benefits on
the basis of the plaintiff's back ailments.

On appeal, the court has been unable to ascertain whether the plaintiff submitted any
medical documentation to show significant objective findings relating to issues with her back.  It

appears that she did not.  While the administrative record contains a note from Dr. Sutton indicating that the plaintiff was "totally disabled *until healed*," this note appears to relate to the plaintiff's cervical spine surgery on her neck rather than any back pain.  Thus, the plaintiff apparently relied upon the medical documentation submitted prior to Aetna's initial denial as part of her appeal and Aetna appears to have reviewed the original documentation and reasonably decided that the plaintiff had not submitted significant objective findings to substantiate a Total Disability.

Although this is another issue that the court will address later regarding the plaintiff's claims of procedural anomalies, it does not appear that Dr. Blumberg considered Dr. Sutton's TDAO or even his progress or observation notes from August 2010 through November 2010 in reaching his determination that the plaintiff was not totally disabled under the LTD Plan.  *See* AR-000108-AR-000111.[19]  Dr. Blumberg did review the MRI reports and Dr. Getz's peer review report, which at least summarized some of Dr. Sutton's findings and observations, but for some reason did not consider Dr. Sutton's documentation.

While the failure of Dr. Blumberg to consider Dr. Sutton's medical documentation would appear at first glance to be troublesome and serve as a factor to a finding that Aetna acted in an arbitrary and capricious manner in denying Total Disability benefits, a further review of his report negates such a finding.  More specifically, since the plaintiff did not submit any additional documentation relating to her back injuries as part of her appeal, Aetna already had sufficient information in the record to render a determination that she was not totally disabled, and it had a peer review report from Dr. Getz in which he had considered all of Dr. Sutton's documentation, including the TDAO.  Thus, Dr. Blumberg's report is best viewed as being limited to the

---

[19] The defendants repeatedly assert that Dr. Getz and Dr. Blumberg reviewed all documents submitted by the plaintiff.  *See, e.g.*, Defs.' Resp. at 7 ("The denial letters and peer review physicians' reports state that all the documents she submitted were duly considered[.]").  The record obviously directly contradicts the defendants' assertion, at least with regard to what Dr. Blumberg considered in rendering his peer review report.

information submitted as part of the appeal, namely Dr. Fitzsimmons February 2011 examination and observations and Dr. Sutton's note relating to the disabling effect of the cervical spine surgery of the plaintiff's neck.  Accordingly, Aetna still had substantial evidence in the record to affirm its denial of Total Disability benefits based on the plaintiff's back issues without Dr. Blumberg's report, and upholding the denial was not arbitrary or capricious because of this omission.

As for the plaintiff's neck pain, the plaintiff points out that she had cervical spine surgery in January 2011.  It appears that the documentation relating to this procedure was not submitted to Aetna prior to its initial Total Disability LTD benefits denial, *see* AR-000008-AR-000009, and, as such, was only considered on appeal.  There are no notes in the record relating to the surgery, and the only medical documentation submitted thereafter relates to Dr. Fitzsimmons' February 2011 physical examination.  Although Dr. Fitzsimmons noticed possible neuropathy and a lack of flexion in the plaintiff's ankles, there were no particular findings relating to her neck.

The only documentation in the record, other than the references that the plaintiff had cervical spine surgery, which would potentially support a finding of a Total Disability was the fact that the plaintiff actually had the aforementioned surgery and Dr. Sutton's note that (1) he found her to be "totally disabled ***until healed***" and (2) it would take four to six months for her to apparently recover from the surgery.  AR-000025, AR-000027.  By virtue of Aetna awarding the plaintiff Total Disability benefits for the period of January 26, 2011, through March 13, 2011, Aetna obviously determined that the cervical spine surgery was something that would render the plaintiff unable to work at any occupation for a minimum of 25 hours per week.  Regarding the length of the Total Disability award, the court recognizes that Dr. Sutton was the plaintiff's treating physician and he had been treating her for almost a year according to the information in

the administrative record.  Nonetheless, Dr. Sutton's doctor's note does not explain why the plaintiff would be totally disabled for a period of 4-6 months.

In addition, Aetna had the report of Dr. Blumberg, who, as indicated above, explained (albeit in a revised report) that the Medical Disability Advisor stated that the maximum allowable time to be out of work for the surgery would be 42 days.  AR-000110.  Without any documentation or additional information from Dr. Sutton about his opinion for finding that the plaintiff was disabled for 4-6 months, Aetna could reasonably rely on its peer review physician's report in determining that the maximum period for remaining out of work was 42 days. Moreover, Dr. Blumberg had reviewed Dr. Fitzsimmons report and observations of February 3, 2011, which, despite being approximately a month after the plaintiff's surgery, did not reveal any pathologic condition precluding the plaintiff from any workload activities.  *Id.*  Accordingly, Aetna had substantial evidence in the record to support its determination that the plaintiff had not supplied significant objective findings to support a determination that her cervical spine surgery resulted in a Total Disability that would have existed beyond the 42-day period.

> b.   The Plaintiff's Claims of Procedural Anomalies

The plaintiff also argues that various "procedural anomalies" in the record suggest that the defendants' decisions to deny her benefits were arbitrary and capricious.   The court recognizes that

> [p]rocedural bias in the review process is another factor to examine. *Post v. Hartford Ins., Co.,* 501 F.3d 154, 164 (3d Cir. 2007). Procedural anomalies that call into question the fairness of the process and suggest arbitrariness include: relying on the opinions of non-treating over treating physicians without reason, *Kosiba v. Merck & Co.,* 384 F.3d 58, 67–68 (3d Cir. 2004); *Ricca v. Prudential Ins. Co. of Am.,* No. 08–257, 2010 WL 3855254 *7 (E.D. Pa. Sept. 30, 2010); failing to follow a plan's notification provisions, *Lemaire v. Hartford Life & Acc. Ins. Co.,* 69 Fed.Appx. 88, 92–93 (3d Cir. 2003); conducting self-serving paper reviews of medical files, *Post,* 501 F.3d at 166; relying on favorable parts while discarding unfavorable parts in a medical report, *id.* at 165; denying benefits based on inadequate information and lax investigatory procedures, *Porter v.*

> *Broadspire,* 492 F.Supp.2d 480, 485 (W.D. Pa. 2007); and, ignoring the
> recommendations of an insurance company's own employees, *Post*, 501 F.3d at
> 165.

*Morgan v. The Prudential Ins. Co. of Am.*, 755 F. Supp. 2d 639, 643 (E.D. Pa. 2010).  Keeping

these principles in mind, the court will address each of the alleged procedural irregularities.

(1)       Aetna's Alleged Selectivity in its Review of the Record

The plaintiff's first claim of a procedural anomaly relates to her assertion that the

defendants selectively relied upon portions of the record in terminating her benefits.  *Id.* at 18.

She claims that the defendants failed to consider, *inter alia*, the entire November 2010 MRI,

which showed enhancing granulation at the surgical site, and the findings by Dr. Fitzsimmons

that the plaintiff had a lack of reflexes in her ankles and atrophy in her left leg.

With regard to the initial denial of continued LTD benefits for a total disability, there is

no evidence in the record that Aetna did not consider the "November 2010 MRI" or any other

medical records in concluding that the plaintiff was not totally disabled under the LTD Plan.[20]

To the contrary, Aetna's denial letter indicated that it did consider the October 2010 MRI and the

office visit notes by Dr. Sutton in evaluating her claim for LTD benefits.  *See* AR-000008.

Although Aetna did not specifically reference the results of that MRI in its denial letter, there is

no indication that Aetna did not consider it.

Similarly, concerning Dr. Fitzsimmons' observations that the plaintiff exhibited an

absence of reflexes in her ankles and marked atrophy in her left leg, both Dr. Blumberg and

Aetna indicated that they had reviewed her report in reaching their respective determinations.

*See* AR-000002, AR-000109, AR-000110.  While Aetna did not recite every observation from

Dr. Fitzsimmons' report, there is no indication in the record that it purposefully ignored any

---

[20] It appears from the record that the plaintiff's reference to a November 2010 MRI is a typographical error as the MRI containing the finding of enhanced granulation occurred in October 2010.  *See* AR-000064.  Thus, the court will refer to it as the October 2010 MRI.

findings helpful to the plaintiff.  In fact, Aetna's appeal denial letter specifically noted that Dr. Fitzsimmons' report showed that the plaintiff had "decreased sensation to light tough in the left lateral leg and left lateral foot," and "EMG testing revealed nerve damage in both [of her] legs." AR-000002.  Although it does not appear that Aetna mentioned the lack of reflexes in the plaintiff's ankles, there was also no medical determination that the lack of reflexes in the plaintiff's ankles related to a finding of a Total Disability.  Thus, the alleged selectivity used by Aetna in its decision-making would not serve as a factor in finding that it acted arbitrarily and capriciously in denying Total Disability benefits beyond March 13, 2011.

(2)     Consideration of Dr. Sutton's TDAO Report

The second alleged procedural anomaly referenced by the plaintiff is the alleged failure to consider the TDAO report by Dr. Sutton.  The court has previously discussed both Aetna's and the peer review physicians' treatment (or lack of treatment) of this report in the above-discussion.  To repeat, prior to Aetna's initial denial, there is no indication that Aetna or Dr. Getz did not consider Dr. Sutton's TDAO report.  While it was not identified as a TDAO report in Aetna's or Dr. Getz's recitation of the documents considered, they stated that they received his report dated "11/16/10" and the only such report in the administrative record is the TDAO report. AR-000008, AR-000100.  They also stated that they reviewed the report.  AR-000008, AR-000100.

As referenced by the plaintiff, failing or neglecting to address particularly relevant portions of a treating physician's findings is a factor in determining whether a decision is arbitrary and capricious.  *See Branca v. Liberty Life Assurance Co.*, Civ. A. No. 13-740, 2014 WL 1340604, at *10 (E.D. Pa. Apr. 3, 2014) (describing plan administrator's neglect in addressing "key portions" of the treating physicians' findings was a factor to consider in whether the plan administrator acted in an arbitrary and capricious manner).  Here, neither Aetna nor Dr.

41

Getz specifically addressed Dr. Sutton's TDAO conclusion that the plaintiff had a Total Disability in the body of their respective decisions and opinion, and there is nothing in the record indicating why they failed to do so.  Also, on appeal, Dr. Blumberg appears to have not considered this document at all, and while it appears that Aetna considered it as part of the overall documentation on appeal, it did not specifically reference Dr. Sutton's Total Disability opinion in its analysis.  Thus, with the exception of Dr. Blumberg, it does not appear that Aetna refused to credit or consider Dr. Sutton's opinion; instead, they neglected to specifically address it in their decisions or opinions.

Nevertheless, as already explained above, it is unclear from the medical documentation attached to Dr. Sutton's TDAO report, which forms the basis for his opinion, as to why the plaintiff's ailments rendered her incapable of working at any occupation for a minimum of 25 hours a week.  Also, even if the court were to determine that Aetna's failure to specifically address this document in its denial (or the affirmance of its denial) was probative, it would serve as only a factor in the overall analysis as to whether Aetna's decision to deny Total Disability benefits was arbitrary and capricious.  *Id.* at *12 (stating that plan administrator's "failure to give full consideration to the findings of Plaintiff's treating physicians is not dispositive of the question of whether [the plan administrator's decision] was 'arbitrary and capricious,' but rather is only one factor to consider among 'the totality of [the insurer's] actions.'" (quoting *Sanderson v. Continental Cas. Corp.*, 279 F. Supp. 2d 466, 477 (D. Del. 2003) (final alteration in original)).

(3)    The Record Containing Inadequate Information

For her third claim, the plaintiff asserts that Aetna failed to properly develop the record so it could reach a fair determination as to whether her medical documentation contained significant objective findings to support a Total Disability.  Pl.'s Mem. at 20-21.  The plaintiff acknowledges that Aetna did not have a duty to develop the record as would ordinarily occur in a

social security disability case.  *Id.* at 20.  Nonetheless, the plaintiff indicates that the administrative record repeatedly referenced other procedures, treatments, and visits with other doctors and, despite these references, Aetna did not act to secure these documents.  *Id.*  As examples, the plaintiff points out that the administrative record showed that she had been receiving physical therapy for her back and Dr. Sutton had given her a script for a lumbar epidural injection.  *Id.*  Dr. Fitzsimmons also referenced the plaintiff going through a variety of treatment modalities.  *Id.*  The plaintiff further referenced other treatments in her appeal letter.  *Id.* at 21.  Thus, the plaintiff contends that, at a minimum, the court should remand the case to Aetna for the acquisition and consideration of these additional records.  *Id.*

As the defendants point out (and the plaintiff acknowledges), it was the plaintiff's burden, and not Aetna's, to provide significant objective findings that would support a Disability finding.  The plaintiff has pointed to no case holding that the insurer has an independent duty to develop the administrative record for the plaintiff.[21]  In addition, Aetna advised the plaintiff of her burden in her initial review letter, and the initial denial letter informed her of her responsibility to submit additional records for review.  AR-000008-AR-000009, AR-000094-AR-000095.  It also appears that Aetna communicated with the plaintiff to ensure that it had all of the documentation that the plaintiff wanted it to consider as part of her appeal.  AR-000256-AR-000257.  As Aetna had no duty to acquire its own information, the failure to do so would not factor in a finding of arbitrary and capricious conduct in this case.  *See, e.g.*, *Pinto*, 214 F.3d 377, 394 n.8 (3d Cir. 2000) (explaining that the court was not holding that the plan administrator had a duty to conduct an investigation), *overruled on other grounds by, Metropolitan Life Ins. Co. v.*

---

[21] The plaintiff cites to *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 115 (2008) for the proposition that the insurer has "a duty to obtain sufficient information to render a fair decision."  Pl.'s Mem. at 20.  The court has reviewed *Glenn* and could not find this proposition located therein.  Even if it did, the LTD Plan in this case clearly places the burden on the plaintiff to provide the necessary documentation of significant objective findings.  *See* AR-000575.

*Glenn*, 554 U.S. 105, 112 (2008).  Therefore, the status of the administrative record was not a factor that would weigh in favor of a finding that Aetna acted in an arbitrary and capricious manner, and there is no justification for remanding the case to Aetna for additional consideration.

(4)   The Defendants' Reliance on Non-Examining Physicians and Failure to Order an Independent Medical Examination

For her fourth and final claim, the plaintiff asserts that Aetna heavily relied upon the paper reviews of Drs. Getz and Blumberg to support its decision at the expense of the opinions of her treating physicians.  Pl.'s Mem. at 21-22.  As discussed below, the court does not find that this assertion, even if true, would serve as a factor leading to a finding of an arbitrary and capricious decision by Aetna in this case.

The court notes that when "the insured's treating physician's disability opinion is unequivocal and based on a long-term physician-patient relationship, reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason to deny benefits."  *Harper v. Aetna Life Ins. Co.*, Civ. A. No. 10-1459, 2011 WL 1196860, at *10 (citing *Kaufmann v. Metro. Life Ins. Co.*, 658 F. Supp. 2d 643, 650 (E.D. Pa. 2009)).  Here, however, there is no evidence in the record to suggest that, with the exception of two pieces of information, that Aetna gave greater weight to the reports of Dr. Getz and Dr. Blumberg than it did to the plaintiff's treating physicians.  The two pieces of information happened to be Dr. Sutton's TDAO report and Dr. Sutton's February 2011 doctor's note.  As explained earlier in this opinion, there was insufficient evidence in the record to support either of those "opinions," and Aetna was not unreasonable in not crediting those opinions in its determination in this case.  Other than the ultimate determinations of the peer review physicians, the plaintiff does not point to anything in these physicians' opinions that are inconsistent with the clinical information in the administrative record.   Under those

44

circumstances, to the extent that Aetna relied upon the reports of its peer review physicians, doing so was not arbitrary and capricious based on the record in this case.

Regarding the failure to order an independent medical examination ("IME") of the plaintiff, the LTD Plan allows Aetna to obtain an IME, but does not require one.  *See* AR-000457.  "[N]umerous courts in [the Third C]ircuit have held that there is no legal requirement for a plan administrator to demand an independent medical examination as part of its review of a claim for disability benefits under an ERISA-governed plan, even if the plan permits it to do so." *Sollon v. Ohio Cas. Ins. Co.*, 396 F. Supp. 2d 560, 586 (W.D. Pa. 2005) (discussing cases). Despite this lack of a legal requirement, other courts have concluded that "a decision to forego an IME and conduct only a paper review, while not rendering a denial of benefits arbitrary *per se*, is another factor to consider in the Court's overall assessment of the reasonableness of the administrator's decision-making process." *Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F. Supp. 2d 546, 563 (W.D. Pa. 2009).

In this case, the court does not find that the failure to obtain an IME is a factor leading to a determination that Aetna's denial of Total Disability benefits was arbitrary and capricious.  In this regard, the particular issues complained of by the plaintiff, even with her complaints of pain, are "amenable for consideration by means of a file review." *See Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, 776 F. Supp. 2d 33, 49 (W.D. Pa. 2011) (stating that "the failure to procure [an IME] may be unreasonable where the specific impairments or limitations at issue are not amenable to consideration by means of a file review" (citations omitted)).  Once again, it does not appear from the record that Aetna disagreed with or disputed any of the diagnoses from the plaintiff's treating physicians, and other than Dr. Sutton, none of the treating physicians opined that the plaintiff met the requirement of a Total Disability or placed any restrictions on her ability to work.  There were no significant objective findings in the record to support a determination

that the plaintiff could not work, for example, in a sedentary position using her upper extremities. Therefore, the court will not consider Aetna's discretionary decision not to order an IME as a factor that would weigh in favor of finding that it acted in arbitrarily and capriciously.

### III.     CONCLUSION

The court's review of the administrative record in this case shows that there are no genuine issues of material fact that would preclude the entry of summary judgment in this case. More specifically, there are no genuine issues of material fact that would preclude the court from determining that the plaintiff has not met her burden to establish that the defendants' denial of Total Disability benefits under the LTD Plan after March 13, 2011 was arbitrary and capricious. Under the arbitrary and capricious standard of review, the court cannot substitute its own judgment for that of the defendants in determining the plaintiff's eligibility for continued LTD benefits under the LTD Plan.

The administrative record simply does not contain significant objective findings of impairments that would preclude the plaintiff from performing any compensable employment for a minimum of 25 hours per week. Although the plaintiff appears to have significant impairments through her mental illnesses, those illnesses cannot support a finding of Total Disability in this case because those illnesses are specifically excluded from the definition of a Total Disability under the LTD Plan. Additionally, although some of the plaintiff's subjective complaints of pain can be substantiated by objective findings in the record, the defendants could reasonably find that those findings are insufficient to meet the definition of a Total Disability because there is nothing in the record linking them with the plaintiff's inability to work at any compensable job for a minimum of 25 hours per week. Moreover, even though Aetna did not submit the plaintiff for a IME or specifically address Dr. Sutton's TDAO report, and even if those facts would weigh towards a finding that the defendants acted arbitrarily and capriciously, the court's overall

assessment of Aetna's conduct in this case demonstrates that there are no genuine issues of material fact that it acted in an arbitrary and capricious manner in denying Total Disability benefits after March 13, 2011.   Accordingly, the court will deny the plaintiff's motion for summary judgment and grant the defendants' motion for summary judgment.

An appropriate order follows.

BY THE COURT:

/s/ *Edward G. Smith, J.*
EDWARD G. SMITH, J.